Good morning, your honors, and may it please the court, Doug Keller on behalf of Mr. Pairis. To begin with, Mr. Pairis's purported waiver of his marina rights was not knowing and intelligent. After he was read his rights, he immediately expressed confusion about what it meant to waive his rights. His interrogators recognized that he was confused and they attempted to dispel that confusion and they spent about 15 minutes with him going round and round about what waiver meant. Judge, can I ask you this, am I wrong in thinking, in reading the transcript to suggest that your client was confused, but he was confused in the direction of thinking the consequences of waiver were more severe than they really were? Not entirely. I think one thing that the interrogators missed was that when he initially was told that his statements could be used against him in a different proceeding, that was the first time he expressed confusion. I think that sort of played out in his comments and I think that meant that he was confused about whatever he said today, if he then were to take back his comments, if he were to waive, did that mean that statement could still be used against him? And I think that's sort of implicit in a lot of what he's saying. In other words, if he- I thought the dispute was whether the waiver was permanent versus temper. I thought that was the whole fight as to what that particular Spanish word, how it translated into English. What you just said strikes me as something quite different. Am I missing, is there a disconnect? I think it's sort of part and parcel of the same thing. I think his sort of fundamental misunderstanding was once he waives, does that mean he forever can't re-invoke his rights? And so in some ways that played out as sort of along the lines Your Honor is mentioning, if he could stop talking or stop or get an attorney. I'm sorry, I have another question if I may. I'm looking at ER 80 and where they're going through the rights one by one, down at the bottom. He says, anything you say can be used against you in a court or in any other proceeding. You do understand. And the only answer is, uh. Is there any place else in the record where that specific aspect of the rights is discussed with him? No, and that was- He affirmatively says he understands it because the others all are yes, yes. And then this time he says, uh. No, it wasn't. And I think that sort of goes back to the temporal aspect, where I don't think he ever really got if he said something when he took back, when he, for lack of a better phrase, sort of re-invoked his rights, if that meant everything he had said went away, or that meant once he said it, it was out there for forever and ever and could always be held against him. And as Your Honor pointed out, I think that's the first time and really the only time that sort of aspect of the waiver is, or that aspect of the rights is discussed. The interrogators are really more concerned, ultimately, with whether he understood that he could talk to them and he needed to waive his rights in order to talk to them. But they never sort of go back to that concept of, if I say something, can that later be used against me, or is it always out there for forever? He was confused about that. I think he was worried that if he waived on this occasion, he wouldn't be able to resist future attempts to question him, or perhaps, I don't know if it would extend this far, but that if he ever went to trial, that he wouldn't be in a position at that point to invoke his rights then. That obviously suggests that the consequences of waiver are quite grave, and that's what I think the agents were doing their level best, to try to say, no, no, no, it's really not that bad. You're just waiving to talk to us on this one occasion, and in fact, if in the middle of talking to us you want to stop answering questions, you're perfectly free to do that. It seems to me that's what he was confused about, not on the point as to whether anything he said on that one occasion could ever be used against him. He seemed to get that concept. I guess I disagree, and I can only point your honor to, I think, two places in the record, and I think the first one is where Judge Gerber pointed to on ER 80, when this is mentioned, whether it could be used against him in a future proceeding, and he says, uh. I think part of the problem here is that there was just a lot of general confusion, and it just ultimately never got cleared up, ultimately. He never really got what that meant. The other place, that's the one. What's the second one? The other place is on ER 88, where he says something to the effect of, if I speak to you now, whether it's good or bad, that's sort of forever out there, and he sort of like tries to like dance around this concept of, and he doesn't expressly state that, but I think it's sort of clear in context, that he was trying to figure out, if I say something today, does that mean I can't ever take it back, that this is sort of me pleading guilty? And I think that's even something the district court echoed at one point, although I don't have that ER site. But the judge seemed also concerned that my client believed that he essentially more or less was pleading guilty if he talked, and I just don't think he ever... Well, he said, yeah, on 88 he says, it says here I waive them freely, so freely, that is, instead of signing, and afterwards I cannot, that is, defend myself in any way. I think ultimately he just never, he never got it, and I think when you sort of read the transcript as a whole, he's clearly confused, and then there's the reference to the son more or less being found responsible for the drugs, and he sort of gives up, he gives up at that point. He says, he doesn't care anymore. That's a different issue, though, isn't it? Isn't that your coercion issue? It is. I think it's different, but I think it's related in the sense that I think it explains why he ultimately stopped caring about what waiver meant. I mean, you see him go on for 15 minutes asking these questions, and then he stops, and I think the reason why he stopped is because his son was referenced, but it is true also that the coercion issue is different related to that. I think you're right that whatever confusion he was operating under, it never got cleared up. I think he just gave up trying to figure it out once the son's fate was introduced, but I guess I'm not convinced, and I'll think about it more after I hear from the government, that the district court judge here was clearly, you know, committed clear error in interpreting the transcript the way I suggested. I grant you that the two places you pointed to could suggest a slightly different interpretation, but this is clear error review. I don't know, the judge who heard, am I right that there was an evidentiary hearing on that? There was, but he never watched the DVD. Both sides sort of agreed that they were happy with him just reading the cold transcript. So this isn't a situation where the trial judge, you know, saw demeanor. In fact, I think at one point he asked defense counsel, are you relying on demeanor? We said no, and he didn't go off that. It's sort of just based on the dry words, and as far as deferring to a finding, Judge Burns certainly ultimately found the waiver was knowing and intelligent, but he never pointed to a place in the transcript where this confusion was dispelled, and he didn't, I don't think he really expressed the concern you're raising, Your Honor. I think he just sort of more generally thought it seemed like somewhere in the transcript he got it, and I think the sort of the real confusion on the lower court's part here was he was really more focused on whether the officers intended to trick him, which just isn't relevant, but that was sort of ultimately what he was focused at. So once you sort of start from that starting place, it sort of follows that it's very difficult to get into the mind of the officers and figure out what they were trying to do, but that being said, it's just not relevant. Well, it is relevant to the voluntariness inquiry. It's very relevant there. It's just not to the knowing and intelligent part. Well, it is and isn't. I mean, even under the voluntariness inquiry, the state of mind of the police officers is still not relevant. I mean, the important part still is, you know, the objective significance of their words. So you see that in cases like Moran, where the court expressly says the state of the mind of the police is just simply irrelevant. The state of the mind, but the state of their mind, but they do have to have been found to engage in some kind of coercive conduct, and so that obviously, what was their aim in trying to, I mean, they weren't trying to trick him. I don't think, I think it's fair to say that they weren't trying to threaten. I didn't watch the DVD either, but just looking at the transcript, it doesn't seem like the He was just trying to say, look, this is what's going to follow if you decide not to talk to us. Well, I think, you know, whether the interrogators had some sort of evil intent, I don't know. But I think it's also clear the import of the words was to put a lot of pressure on my client to waive based on invocation of the son. And so even if you struggle with the knowing, intelligent part of this, I think the voluntariness is straightforward. I mean, at the end of the day, he was put to a terrible choice. And I think most parents would say, are you telling me if I don't, if I don't sign this piece of paper, my son's going to be found responsible. I think nearly any parent is going to sign that piece of paper. And so that means he was coerced into doing that. Cases like Tingle and Brown make clear that using kids in that way is inappropriate. Did you want to save some rebuttal time? I did. Thank you, Your Honor. We'll hear from the government. Your Honors, may it please the Court, Stacey Sullivan on behalf of the United States. I'd first like to address the issue of voluntariness because I believe that this case absolutely does not represent any type of undue coercion on the part of the officers. It does not represent the facts of the United States versus Tingle. These officers bent over backwards to explain Miranda rights to this defendant. And they repeatedly attempted to clarify with him. And one of the things I want to convey to this Court this morning is, when you read the transcript, I concede, it's highly confusing and frustrating to read. Is there any place other than page 80 that I was pointing to where there was a discussion of the use of his statements in court against him where he affirmatively said that he understood? No. And that was one of the big issues at the hearing. And this evidentiary hearing went on for three days. Detective Mercado testified extensively, as did the defense's expert court-certified interpreter. He never affirmatively states that he understands what he says can be used against him in any future proceeding. However, the detective repeatedly clarifies to him in Spanish that very fact after, on the record in 88. But he can communicate to his heart's content. The question is whether, in fact, the person indicates that they understand it. I agree. It's not a one-way ratchet. I mean, he can say it a hundred times with a smile on his face. But if the person then says, I don't understand what you're saying to me, he doesn't say that. But he never affirmatively says, yes, I understand that as well. I agree. But simply because in answer to that one direct question, he does not make the affirmative statement, does not mean the record as a whole doesn't demonstrate that he knew exactly what he was waiving here. Before in the record, is there an indication that he knew exactly what he was waiving? What's the strongest part of the transcript, in your view, that indicates he knew what he was waiving? I think taken as a whole, you have to start with first on page 80, where he asks him the specific questions. And I think three out of the five he answers, yes, absolutely, I do understand. Is that enough, you think? No. But then there's the repeated clarification of Detective Mercado. And when you read the transcript, you have to take out the back and forth in English between Detective Mercado and Agent Morse, because it muddles up the transcript and the defendant wasn't listening to this back and forth and their confusion with each other. Except at the place where we've been talking about, which seems to me an essential portion of the Miranda warnings, that what you say now can be used against you in court. I mean, that's kind of the whole point. And there's no side discussion there. It goes on for many lines without interruption before this question, many lines afterwards on page 81 with no interruption. So I'm not sure that at least as to that point that the, you know, chaos of the room really comes into play. The chaos of the room, I would submit, was mostly between Agent Morse and Detective Mercado. Right, but it wasn't happening right then. Yes, and then if you go on and you follow the interview to its completion and you have this repeated explanations, and there's a discussion here. This defendant was not unintelligent. And I believe Judge Burns said it very well. There was an intelligent discussion of an abstract concept, the dichotomy between temporarily speaking and the impermanent effect of these words. This defendant was trying to figure out, I think, precisely what the court has indicated, and that is, look, am I pleading guilty now? If I talk now, am I just saying I give up? Can I go back and try to fight this later? And they repeatedly, using the correct terms, renunciar, this is a permanent waiver in the sense that anything you say can be used against you. But it's temporary in that you can then... But he didn't get that distinction. That was the problem. That's what the interpreter was saying, that the wrong word was used to convey what the officers were trying, the agents were trying to convey. The wrong word was used, and that evidence was before the court. Well, but even the interpreter conceded the right word was used. Renunciar was used. And then he stated that is the correct word for waive. There should have been some further explanation as to whether the renunciation was temporary or permanent. There was. Because renunciar, my understanding of the evidence was that renunciar indicated permanent unless you put some qualifier in front of it. Yes, and Detective Mercado did put repeatedly a qualifier on it in the record. He repeatedly states, you can stop this at any time. But the word he used, the interpreter said, was not the appropriate qualifier. The Spanish word he used was not the appropriate qualifier to convey that it was temporary. Well, I disagree of that reading of the record because the only word that the interpreter said was not used correctly was entregar. Right. And on cross-examination and pointing out to him on the record, the interpreter admitted the only time Detective Mercado used the word entregar was to say this is not the correct term. This is not what you're doing. You are not entregar in regards to your rights. You are renunciar. And then he adds an additional qualification saying, this is temporary in that at any time you can invoke your rights and stop talking to us. And I think the defendant's actions of agreeing to waive his rights ultimately, he did it. He knew exactly what he was doing. He signed the waiver. The question for us is whether he ultimately understood it. I think the record as a whole over the three-day evidentiary hearing demonstrates this defendant knew exactly what he was doing. May I ask you about the judge's comments? Yes. The judge said this was an extremely close case and it appeared to me that the judge's decision hinged on his determination that there was no misconduct on the part of the police. Is that the standard for us to determine whether or not the waiver was known involuntary? No. What do we do with that reasoning by the district court? Well, I think that first and foremost, he wanted to get out of the way the issue of voluntariness. I think he made a very decisive decision that this did not remotely resemble a Tingle analysis where you had a mention of a two-year-old infant, you're going to go away for 20 years, you're never going to see your child and there was no legitimate reason to mention that two-year-old child and that is not the case here. Now, he was talking about in terms of the knowing involuntariness. He said there's no reason to suppress this. Well, I don't think the police did anything wrong and they did endeavor to communicate. Yes. So, is that the standard we use to determine whether or not there was a knowing involuntary waiver? Well, you're going to look at three things. You're going to look at the age of the defendant. You're going to look at their experience with the criminal justice system. We have a 48-year-old defendant with zero experience with the criminal justice system. The only other thing you can look at other than the defendant's subjective statement of this is what I thought at the time in his declaration because he did not testify at the hearing is how the officers conveyed the Miranda warning. But that's not the test. That's what I was saying before in my discussion with you. They can convey beautifully in a friendly tone completely no misconduct, zero misconduct and still the person might not understand their rights. So, isn't that really the question? It's wonderful that there was no misconduct but that's kind of not the end of the inquiry it seems to me. Isn't the question whether we can tell whether he actually understood the rights that were read to him? That is the question I think looking at the three-day hearing in light of the clear error standard that this judge made the correct decision that he took three days of testimony. He looked at it and he determined that this defendant understood what he was waiving and that he signed the waiver of rights and that there was no coercion that forced him to do that. In essence, they're saying he was confused but what really caused him to do this was the fear that his son was going to be prosecuted. Just speaking for myself, I agree with your reading on coercion but that also doesn't answer the question about knowing and intelligent because you can be non-coerced and still not understand, correct? Correct. I think the point that the judges correctly bring out was if there was any confusion, it was am I pleading guilty here today? Which is a greater right. If he was confused, he was confused to his benefit when he waived it. He thought he was pleading guilty if he was confused. I do not think he was confused. Let me put that on the record. But he thought if I talk now, I have no further recourse which in fact was not true and they attempted to explain that to him. Could you tell me where in the district court judges ruling you think the district court judge said he understood the rights that were being conveyed to him? I believe it was... And I'm sorry, I don't... Let me grab mine. The excerpt of record page 49 through 50. I think that's the closest the district court gets to explaining that he in fact did understand. Well, you've exceeded your time. Thank you. So we'll take a look at those pages of the transcript. Thank you very much. And you have some rebuttal time remaining. Thank you. Just briefly, Your Honor, I really only have one point to make, which is that the government today is tacked as sort of the same one it took before the district court, which is that the record as a whole somehow establishes my client knew. But I think it's interesting that neither the government nor the district court could identify where in this 18 to 20-page transcript my client knew. He continued to express confusion and that's sort of what we're left with. If the court has no further questions... I don't believe we do. Thank you. The case just argued is submitted and once again I thank both counsel for helpful arguments.
judges: Graber, Rawlinson, Watford